## THE STATE vs. WHITE.

*April 17 — May 15, 1886.*

*Embezzlement: Unissued municipal bonds: Nature of possession by city comptroller.*

1. Unissued negotiable bonds of a city in the custody of the city comptroller are property for the taking and conversion of which he may be found guilty of embezzlement under sec. 4418, R. S., even though the city may not be liable on such bonds.

2. A city comptroller in whose office the meetings of the commissioners of the public debt of the city were required to be held, who was *ex officio* secretary of such commissioners and was required to keep an accurate account of the issue of all bonds by the city, and in whose custody certain bonds were placed by said commissioners to be held for the city until they should be delivered to the proper persons, is *held* to have had possession of such bonds as an officer or agent of the city and by virtue of his office or employment, within the meaning of sec. 4418, R. S.

REPORTED from the Circuit Court for *Milwaukee* County.

The case is stated in the opinion.

*W. C. Williams*, District Attorney of Milwaukee county, and the *Attorney General* were the attorneys of record for the plaintiff. *Austin, Runkel & Austin* were attorneys of record for the defendant. The cause was submitted upon both sides on unsigned briefs.

For the defendant it was contended, *inter alia*, that the so-called bonds did not come into his possession in his capacity as an officer of the city. The law gave the comptroller no authority to take, receive or control them, and he had no duties in connection with them except to countersign them. To warrant a conviction under sec. 4418, R. S., the defendant's possession must have been acquired by authority given to him in his official capacity. 3 Archb. Crim. Pr. 453–4; 1 Russell on Crimes, 178; 1 Whart. Crim. Law, 1019, 1012, and note; 3 Crim. Law Mag. 883; *Comm.*

v. *Hays*, 14 Gray, 62; *Comm. v. Williams*, 3 id. 461; *Bartow v. People*, 78 N. Y. 377. The bonds were never legally issued, and hence were void even in the hands of innocent purchasers. They could not, therefore, be the subject of embezzlement or larceny. *Rochester v. Alfred*, 13 Wis. 432; *Veeder v. Lima*, 19 id. 280; *Berliner v. Waterloo*, 14 id. 378; 33 id. 288; *Treadwell v. Comm'rs*, 11 Ohio St. 191; *Gould v. Sterling*, 23 N. Y. 456; *People v. Mead*, 24 id. 114; *S. C.* 36 id. 227; *Walker v. Ebert*, 29 Wis. 196; *Kellogg v. Steinart*, id. 626; *Butler v. Carns*, 37 id. 61; *Wait v. Pomeroy*, 20 Mich. 425; *Thomas v. Watkins*, 16 Wis. 549; *Chipman v. Tucker*, 38 id. 43; *Fisher v. Beckwith*, 30 id. 56; *Burson v. Huntington*, 21 Mich. 416; *Roberts v. Wood*, 38 Wis. 60; *Hillsdale College v. Thomas*, 40 id. 661; *Cline v. Guthrie*, 13 Am. Rep. 357; *Coddington v. Gilbert*, 17 N. Y. 489; *Bank of Kenosha v. McClellan*, 21 Wis. 112; *Bissell v. Jeffersonville*, 24 How. 287; *Knox Co. v. Aspinwall*, 21 id. 539; *Aspinwall v. Dierus*, 22 id. 365. The usage which throws protection around commercial paper cannot be used to establish the authority by which it originally issued. *Marsh v. Fulton Co.* 10. Wall. 676; *Bissell v. Kankakee*, 16 Am. Rep. 554; *McPherson v. Foster*, 22 id. 222; Cooley's Con. Lim. 215; *Mayor v. Ray*, 19 Wall. 468; *Wall v. Monroe Co.* 103 U. S. 78; *Dodge v. Platte Co.* 82 N. Y. 229; *Police Jury v. Britton*, 15 Wall. 566; *Anthony v. Jasper Co.* 101 U. S. 693; *Taylor v. Comm.* 3 Ky. 508; *Cochran v. Wheeler*, 7 N. H. 202; 10 Wis. 280; *Brady v. Mayor*, 20 N. Y. 317. It must be shown that all conditions essential to the validity of the bonds have been complied with. *Venice v. Woodruff*, 62 N. Y. 465; *Starin v. Genoa*, 23 id. 439; *People v. Mead*, 24 id. 114; *S. C.* 36 id. 224.

TAYLOR, J. The defendant, *James White*, was convicted in the circuit court of Milwaukee county upon an information against him for the embezzlement of eight certain

negotiable bonds of the city of Milwaukee, of $1,000 each, and after such conviction the circuit court made a report to this court, under sec. 4721, R. S. The following is a copy of such report.

"[Title, etc.]

"The defendant was tried at the January term of said circuit court, on the charge of embezzling eight general city bonds of the city of Milwaukee, for the sum of $1,000 each, and was duly convicted. On the trial it appeared from the uncontradicted evidence that the defendant, *James S. White,* was comptroller of the city of Milwaukee from the year 1872 to the year 1880; that on or about the 1st day of December, 1873, certain documents called bonds, which were authorized to be issued by the city of Milwaukee under and pursuant to chapter 406 of the [Private and Local] Laws of 1871, were printed in due form, as the laws and ordinances required, signed by the mayor and city clerk, sealed with the corporate seal, countersigned by the comptroller (the defendant), and at and in the office of the comptroller were attested by the commissioners of public debt by said commissioners signing their respective names thereto; that, after being so signed or attested, nothing else was done, or directed to be done, by the commissioners of public debt with said bonds, but the whole number, one hundred in all, were left by the commissioners either lying upon the table where they were signed, or, as they were signed, taken up by the comptroller, who was present, and folded together and piled upon the table. Ninety-two of these bonds were afterwards delivered by the comptroller, or some one in his office, to persons entitled to receive them. Eight of said bonds, bearing numbers 243 to 250 inclusive, remained in the office of the comptroller until the term of office of the defendant expired, and until he retired from office, in the year 1880. The defendant reported to the city of Milwaukee annually, during his occupancy of the office of comp-

troller, that ninety-two of said bonds were outstanding, and inferentially that said eight bonds were still otherwise unissued and remained undisposed of. When defendant retired from office as comptroller, he took the said bonds, and afterwards used them as collateral security to his own notes to secure an indebtedness to a bank in Chicago to the amount of $7,000; and said indebtedness not being paid, said bonds were sold by the bank for $3,500. The city comptroller was made by law *ex officio* the secretary of the commissioners of public debt, and the meetings of said commissioners were required to be held in his office.

"Upon these facts the following questions of law arose: *First.* Were the so-called bonds, at the time they were converted by the defendant, property, for the taking and conversion of which the defendant can be found guilty of embezzlement? *Second.* Did defendant receive said so-called bonds as an officer, agent, clerk, employee, or servant of the city of Milwaukee, by virtue of such office and employment?

"And such questions being, in my opinion, so important and doubtful as to require the decision of the supreme court, and the said defendant desiring and consenting thereto, I, the undersigned, the presiding judge at said trial, do report the case to said supreme court for an answer to said questions.

"A. SCOTT SLOAN, Circuit Judge.

"*Dated January 22, 1886.*"

There is, in fact, strictly speaking, no bill of exceptions in this case, although all the evidence and proceedings had upon the trial appear in the return made to this court. The case must be determined upon the facts as they are stated in the report of the circuit court.

The defendant was informed against and convicted under the provisions of sec. 4418, R. S. The part of the section which is applicable to the case, and under which the state

claims that the defendant was informed against and convicted, reads as follows: "Any officer, agent, clerk, employee, or servant of this state, or of any county, town, school district, city, village, or other municipal corporation therein, . . . who, by virtue of such office or employment, shall have the possession or custody of, or shall be intrusted with, the safe-keeping, disbursement, investment, or payment of any money or fund, or with the carrying or delivery of any goods, wares, merchandise, produce, lumber, or any other property or thing which is the subject of larceny, belonging to, or under the care or control of, the state, or such municipal or other corporation, or in which the state or such corporation has an interest, . . . shall embezzle or fraudulently convert to his own use, or to the use of any other person except the owner thereof, *any such money*, or shall take, carry away, or secrete with intent to convert to his own use, or to the use of any other person except the owner thereof, any such money, fund, goods, wares, merchandise, produce, lumber, or any other property or thing, shall be punished, if the money or property so embezzled shall exceed the value of one hundred dollars, by imprisonment in the state prison for not more than five years nor less than one year," etc.

The statute defining the crime of larceny is sec. 4415, R. S., and reads as follows: "Any person who shall commit the crime of larceny, by stealing of the property of another, any money, goods, or chattels, or any bank-note, bond, promissory note, bill of exchange, order, certificate, book of account, conveyance of real estate, bill of sale, mortgage, valuable contract, receipt, release, defeasance, railroad passenger ticket, ticket of admission to any place, or any writ, process, or public record, or any instrument in writing whereby any demand, right, or obligation is created, increased, diminished, or extinguished, or any personal property whatever, if the value thereof shall exceed the sum of one hundred dollars, shall be punished," etc.

The first question upon which the circuit court desires the opinion of this court is whether the bonds taken by the defendant and converted to his own use in the manner set out in the report, were property, for the taking or conversion of which the defendant can be found guilty of embezzlement. There can be no question that the bonds described in the information are property, within the letter of the section defining embezzlement. By that section the fraudulent conversion or embezzlement of any property or thing which is the subject of larceny is made punishable as embezzlement. The statute defining larceny punishes the stealing of "a bond, promissory note, bill of exchange, or any instrument in writing whereby any demand, right, or obligation is created, increased, diminished or extinguished." The written obligations described in the information were bonds, and they were also instruments in writing whereby a demand, right, or obligation was created against the city.

But it is said by the learned counsel for the defendant that until these bonds were issued by the city, and delivered to some party authorized by law to receive them, they were of no value whatever, except as mere pieces of waste paper, and are not, therefore, within the spirit of the statute, although they may be within the letter thereof. It is clear that the object of the statute was to protect the state, and municipal corporations of the state, against the frauds and peculations of the officers, agents, and servants of the state and its municipalities, and to punish those acts on the part of such officers, etc., which had the direct and necessary tendency to injure and defraud such municipalities. The statute had also in view the protection of those persons who might have legitimate dealings with such officers and agents. Were this plea of an unscrupulous and rascally officer to avail him, and he should be permitted to escape punishment, after he had received the fruits of his rascality, and defrauded some honest citizen by representing that the city bonds had been lawfully issued to him, and that he

was the real owner of them, and so obtained value for them, it appears to us it would be a reproach upon the good sense of the legislators who enacted the law, and a liberality of judicial construction to protect the criminal which would also be a reproach to the administration of justice.   In saying this, we are not unmindful that there are decisions made by the English courts, under similar but not identical statutes, which would seem to sustain the contention of the learned counsel for the defendant; but we also remember that those decisions were made under laws which punished the accused by death if convicted, and for that reason the mercy and humanity of the court was necessarily invoked to spare the accused by a most liberal construction of the statute in his favor, and to subject no one to such an extreme penalty unless clearly brought within the statute, both by the letter and the spirit thereof.   There are also decisions made by courts in this country, which, following the English decisions, have given the same construction to acts of the character of the one now under consideration.

The argument that the city of Milwaukee may not be liable to the holders of the bonds fraudulently converted by the defendant — an argument which may or may not be a sound one, and the determination of which, one way or the other, may depend very much upon the court in which the action to enforce the payment thereof may be brought — does not seem to us a sufficient reason for holding the defendant not guilty of a crime in converting them.   To him the bonds were just as good as though they had been regularly issued; he received the same compensation that he would have received had they been regularly issued; and it would seem to be just that he should not now be heard to say they were merely waste paper.   If the person who purchased them of him shall fail to recover on them against the city, certainly a great injustice has been done to that person, and, though the city may succeed in making a de-

fense, it will be at considerable cost and expenditure, and so far it will be injured by the fraud of the defendant.

In determining whether the conversion of negotiable bonds or promissory notes is a crime under the statute, we must look at the reason for making such conversion a crime; and, in determining that question, we must not only look at the evil effect upon the maker of the bonds and notes, but also the effect upon the persons to whom they are sold and transferred by the person unlawfully converting them. Both effects are to be considered in determining the criminality of the act. In that respect the unlawful conversion and sale of a negotiable bond, bill, or note, which has not been put in circulation by the maker, is (if it be admitted that the holder cannot recover against the maker on the bond or note so put in circulation) in its effects upon the public welfare the same as the forgery of such bond or note and putting the forged instrument in circulation. The supposed maker of the forged instrument cannot be compelled to pay it, but he is likely to be subjected to costs and expenses in establishing its forgery, while the person to whom it is transferred by the forger suffers the loss of his money paid for the forged paper. In a common-sense view of the case, which is generally, if not universally, a sound legal view of the case, the unlawful conversion and sale of a bond or note which the maker has never put in circulation is as much a crime against the community as the forgery of a bond or note and the circulation of the forged instrument.

The law under which the defendant was prosecuted, so far as it has any reference to the embezzlement or fraudulent conversion or secretion of the bonds of a muncipality, was first enacted as a part of the Revised Statutes of 1878; and, in construing it, we must take into consideration the then existing facts. When this act was passed, and for some years previous thereto, it was a very common thing for the cities, counties, towns, and even the smaller munici-

palities of the state, to issue negotiable bonds, either in payment of debts already contracted, or for raising money for the purposes of the city or other muncipality issuing the same; and it became the duty of the officers, or some one or more of them, of such cities or other muncipalities to issue and sell or otherwise dispose of them for the benefit of such muncipalities, and this law was evidently passed in order to protect the muncipalities against the frauds of its officers in the issue and sale of such negotiable bonds.    It would seem to be a very narrow and illogical construction of this act to hold that it had reference only to bonds or securities of other persons held by the cities or other municipalities as a part of their property or assets.    The fact is that the cities and other muncipalities hold but a very limited amount of, if any, negotiable securities, except those òf which they are themselves the makers, and which they hold for sale.    It is a most reasonable construction, under this state of facts, to hold that the legislature intended to protect the muncipalities against the frauds of their officers, agents, etc., in the conversion and sale of the bonds of which they were themselves the makers; such bonds being the only ones they were likely to be possessed of.    This was the view taken by the court of appeals of New York in the construction of a similar law of that state, in the case of *Bork v. People*, 91 N. Y. 5, 17.    See, also, *People v. Wiley*, 3 Hill, 194; and *Comm. v. Rand*, 7 Met. 475.    And we think it is the proper construction of the statute under which the defendant was prosecuted.

The second question reported by the circuit court for the consideration of this court,— viz., " Did defendant receive said so-called bonds as an officer, agent, clerk, employee, or servant of the city of Milwaukee by virtue of such office or employment?"— we think must also be answered in the affirmative.

Ch. 406, P. & L. Laws of 1871 authorized the city of Milwaukee to issue the bonds of which the eight bonds in ques-

. tion in this case are a part. These bonds were issued in pursuance of said ch. 406, P. & L. Laws of 1871, and an ordinance of the mayor and common council of said city approved November 19, 1873. One hundred of these bonds issued under said ch. 406 and said ordinance, bear date December 1, 1873. The second section of said ordinance provides that the bonds to be issued shall be signed by the mayor and clerk, sealed with the corporate seal, be countersigned by the comptroller of the said city, and attested by the commissioners of the public debt. Sec. 5 of the said ordinance directs that the bonds shall be delivered to the commissioners of the public debt, and they are authorized and directed to deliver the proper amount of said bonds, upon warrant signed by the mayor and clerk of said city and countersigned by the comptroller, in payment of certain judgments against said city. Sec. 3 of said ch. 406, P. & L. Laws of 1871, directs the bonds to be issued under that act to be made, executed, and delivered in the same manner as directed by the ordinance. The commissioners of the public debt of the city of Milwaukee were created by ch. 87, Laws of 1861. By sec. 5 of said chapter it is made the duty of said commissioners to superintend the execution, issue, and use of the bonds to be issued under that act. Sec. 2 of said act requires the comptroller of the city to keep an accurate account of the issue of all bonds by the city, of their numbers, and the particular purposes for which issued. Sec. 7 of said act requires the commissioners of the public debt ·to hold their meetings in the office of the comptroller, and he is, by virtue of his office as comptroller, made the secretary of the commissioners, and is required to preserve a full record of their proceedings. Ch. 406, P. & L. Laws of 1871, under which the bonds in question were issued, does not repeal the provisions of ch. 87, Laws of 1861, which require the commissioners of the public debt to hold their meetings in the office of the comptroller, which constitutes the comptroller the secretary of the commissioners, and which re-

quires the comptroller to keep an accurate account of the bonds issued. See sec. 6 of said ch. 406, P. & L. Laws of 1871. Ch. 406, P. & L. Laws of 1871, and ch. 184, subch. 11, Laws of 1874, continue the powers and duties of the commissioners of the public debt, and of the comptroller, in relation thereto, substantially as prescribed by ch. 87, Laws of 1861. It would seem that the learned counsel for the defendant are mistaken in stating that the comptroller had no duties to perform in respect to those bonds except that of countersigning them.

In the statement of facts made by the circuit court it appears that one hundred of the bonds authorized to be issued under said statute and ordinance were duly printed, signed by the mayor and clerk, sealed with the seal of the city, countersigned by the comptroller, and attested by the commissioners of the public debt, and in all respects completed, ready for delivery to the persons entitled to receive them, upon the warrant of the mayor and clerk, countersigned by the comptroller; and, being so made, signed, sealed, countersigned, and attested, the commissioners of the public debt, on or about the 1st of December, 1873, left said bonds in the office of the comptroller, lying upon his table, and that afterwards ninety-two of the said one hundred bonds were delivered by said comptroller, or by some one in his office, to the persons entitled to receive the same, and that the remaining eight of said bonds remained in the office of said comptroller until he retired from office, in 1880; and that, when he so retired from his office as comptroller, the defendant took said bonds from said office, and afterwards deposited them as collateral security to secure an indebtedness due from him to a bank in Chicago, and upon his failure to pay said debt the bonds were sold by the Chicago bank for the sum of $3,500 in part payment of the debt due the bank from such defendant.

The evidence, which is returned to this court, shows that

the evidence in the case was much stronger than the case stated in the report to this court. Mr. Pfister, one of the commissioners, testified that the bonds were handed to the commissioners by Comptroller *White* for attestation, and that, after they were attested by them, they were left with *Mr. White*, and that afterwards they were delivered to the creditors of the city by *Mr. White*, except the eight bonds in question. He also testified that these bonds were turned over by the commissioners to the comptroller, the secretary of the commissioners. The testimony of Mr. Pfister is apparently the only evidence as to how the bonds came into the possession of the defendant, except so far as the records kept by *Mr. White* tend to show that fact.

Upon this evidence, and under the law, it seems to us quite clear that the defendant had the possession of these bonds by virtue of his office as comptroller. His duty to make an accurate record of the bonds issued, rendered it absolutely necessary that he should have the custody of them after they were ready for issue to make such record, and it would certainly be convenient, if not absolutely necessary, that he should retain such custody until they were delivered to the persons entitled to them, in order to make the accurate account of issuing the bonds as required by law. At all events, there was nothing unlawful, on the part of the commissioners of the public debt, in placing these bonds in the custody of the comptroller to hold for the city until they should be delivered to those entitled to receive them. He held them, therefore, not as a wrongdoer, but as an officer or agent of the city within the meaning of the statute.

In accordance with the foregoing opinion the questions reported by the learned judge of the circuit court must be and are hereby answered as follows: First question, "Yes;" second question, "Yes."

*By the Court.*— Ordered accordingly.